**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MOSES T. BILITY, PhD,** | ) | **CIVIL ACTION NO.** |
| | ) | |
| **Plaintiff,** | ) | 2:23-CV-770 |
| | ) | |
| **v.** | ) | |
| | ) | |
| **UNIVERSITY OF PITTSBURGH** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **-and-** | ) | |
| | ) | |
| **DEAN DONALD BURKE** | ) | |
| | ) | |
| **-and-** | ) | |
| | ) | |
| **DEAN MAUREEN LICHTVELD,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

### I.        PRELIMINARY STATEMENT

By this action, Plaintiff, Moses T. Bility, PhD, seeks wage loss, compensatory and punitive damages, and costs and attorneys' fees as a result of being subjected to a racially hostile work environment by the Defendant, University of Pittsburgh, because of his race, African American, and thereafter suffering retaliation for complaining to the Defendant about being subjected to race discrimination, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1) and 42 U.S.C. § 2000e-3(a), respectively.  Plaintiff also brings the present action pursuant to 42 U.S.C. § 1983 against Dean Donald Burke and Dean Maureen Lichtveld for violation of Plaintiff's Fourteenth Amendment Equal Protection Clause rights by the individually-named Defendant acting under color of state law.  Plaintiff also brings this action by 42 U.S.C. § 1981 through 42 U.S.C. § 1983 against all Defendants.

## II.   JURISDICTION

1.      This Court has jurisdiction of this matter by virtue of 28 U.S.C. § 1331, in that this is a civil action wherein the matter in controversy arises under the laws of the United States.

2.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b), in that this is a civil action in which jurisdiction is not founded solely on diversity of citizenship and the acts constituting a substantial part of the events and omissions giving rise to the claims occurred in the Western District of Pennsylvania.

3.      On May 5, 2022, Plaintiff filed a timely Charge of Discrimination with the EEOC against the Defendant, raising substantive allegations supporting claims of hostile environment race discrimination and retaliation.

4.      On February 13, 2023, the EEOC issued a Notice of Right to Sue letter to Plaintiff, notifying Plaintiff that he has the right to file a lawsuit within 90 days of the notice, or by May 14, 2023.

## III.   PARTIES

5.      Plaintiff, Moses T. Bility, PhD ("Dr. Bility"), is an adult African American individual who resides at 300 Liberty Avenue, Apt., 514, Defendant Pittsburgh, PA 15222.

6.      Defendant, University of Pittsburgh ("Defendant Pitt"), is a public, state research university located at 4200 Fifth Avenue, Defendant Pittsburgh, PA 15260.

7.      Defendant, Dean Emeritus Donald Burke ("Defendant Burke"), was at all relevant times at employee of Defendant Pitt acting in his individual capacity and under color of state law.

8.      Defendant, Dean Maureen Lichtveld ("Defendant Lichtveld"), was at all relevant times at employee of Defendant Pitt acting in his individual capacity and under color of state law.

## IV. STATEMENT OF CLAIM

9.      Dr. Bility began working for Defendant Pitt on September 1, 2015 as a tenure-track Assistant Professor in the Department of Infectious Diseases and Microbiology in the School of Public Health. During most of his tenure at Defendant Pitt, Dr. Bility has been one of the only black professors in his department. Moreover, in Defendant Pitt's health sciences generally, Dr. Bility is one of the few black faculty whose work focuses on basic science, with broad implications in scientific research and application to human health.

10.      From 2015 through early 2019, Dr. Bility's performance was never questioned, and he experienced no problems at Defendant Pitt. Dr. Bility's favorable performance reviews were supported by the fact that he had received federal grant fundings for his research program, published peer-review articles, provided teaching and research supervision services and other services at Defendant Pitt. As part of his service contribution, Dr. Bility provided services to reputable scientific journals. In addition to his academic service at Defendant Pitt, Dr. Bility also serves as a field-grade military officer in the United States Army Reserve and has experience (~16 years) and expertise in the functional areas of chemical, biological, radiological, and nuclear defense and consequence management, defense support to civil authorities, health service support and civil affairs. Dr. Bility completed his Bachelor of Science in Biochemistry and Molecular Biology in 2004 and his Doctor of Philosophy in Molecular Toxicology in 2009. Both degrees were obtained at Pennsylvania State University at the University Park campus. Dr. Bility completed his postdoctoral fellowship in Infectious Diseases and Cancer Virology from the University of North Carolina at Chapel Hill. Throughout his academic training Dr. Bility received broad scientific training in biochemistry, chemistry, molecular biology, physical chemistry, physics, toxicology, infectious diseases, virology, immunology, and cancer biology. These training

3

were complemented with training in the military in the chemistry and physics of chemical, radiological and nuclear weapons, including their detection and countermeasures.

11.     All of that began to change early in 2019, once Dean Emeritus Donald Burke ("Defendant Burke"), who, at the time was Dean of Defendant Pitt School of Public Health (now Dean Emeritus of Defendant Pitt School of Public Health, former Director of Defendant Pitt Health Sciences Center for Vaccine Research) and a faculty member in the Department of Epidemiology in Defendant Pitt School of Public Health, learned that Dr. Bility was developing a novel theory to address foundational problems in modeling emerging infectious diseases. This work is part of Dr. Bility's research program that focuses on discovering the interactions between the Earth and its hydroclimate on the biosphere (living things) via employing concepts and knowledge from the physical sciences, namely, condensed matter physics and spin chemistry. This line of research is consistent with the 2010 report by the National Research Council (NRC) of the National Academies of Sciences, Engineering, and Medicine, which asserted that significant advancement in addressing intractable grand challenges in biology, such as the "Interactions of the Earth, its climate and the biosphere" can be achieved by employing concepts and knowledge from the physical sciences.

12.     On January 30, 2019, Defendant Pitt announced by email that Dr. Bility would be making a work-in-progress presentation at the Global Health Inequities and Infectious Diseases Workshop, and Dr. Burke was on the recipient list. In the work, Dr. Bility hypothesized that a weakening geomagnetic field and associated environmental/hydroclimate changes are linked to large-scale human deaths. Dr. Bility proposed a mechanism based on the chiral-induced spin selectivity effect phenomenon, whereby weakening in the earth's magnetic field, and increasing cosmic radiation triggers serpentinization-driven magnetic catalysis of aberrant chiral

biomolecules (including certain viruses from endogenous viral-chiral biomolecules) via interaction with iron in the body. This hypothesis is consistent with the well-established progressive (or escape) hypothesis for the origin of viruses, which posits that elements within the genetic material of cells (bits of DNA or RNA) undergo a transformation, escape cellular control, gain the ability to move between cells, and become parasitic. Furthermore, this work is based on Dr. Bility's idea that biomolecular chiral symmetry breaking and the enantioselective synthesis of homochiral life was mediated by spin-polarized electrons ejected from magnetite (iron oxide) by spin-polarized muons in serpentinization-driven hydrothermal systems in a weakened geomagnetic field in early Earth.

13.     Before the presentation described in paragraph 12 occurred, Defendant Burke requested that Dr. Bility meet with him to discuss his novel hypothesis. Although Dr. Bility found this request to be odd and not in line with customary protocol in the department, though he delayed the meeting, ultimately, he did not feel that he could say no to Defendant Burke.

14.     Therefore, on February 13, 2019, Dr. Bility met with Defendant Burke, who told Dr. Bility several times that he had nothing to contribute and tried to persuade him to not present his hypothesis and give up pursuing the research. During the meeting, Dr. Bility defended his hypothesis and did not agree to end the pursuit of his research. Although Defendant Burke unrelentless badgered Dr. Bility to cease his research, Dr. Bility refused, and Defendant Burke adjourned the meeting.

15.     Dr. Bility proceeded to present his ideas at the global health inequalities and infectious disease workshop at the University of Defendant Pittsburgh on April 12, 2019.

16.     The reason that Defendant Burke tried to persuade Dr. Bility to not present his novel ideas and to discontinue his research on the same was due to his race, African American. Upon

information and belief, Defendant Burke supported the unwritten culture of racial hierarchy within the School of Public Health as one in which whites and Asian faculty are held as intellectually superior to black faculty and are allowed to address foundational questions in science and human health, whereas black faculty are viewed as intellectually inferior and can only address diversity and inclusion issues and health disparities affecting black people.

17.     Beginning in the Fall of 2019 (before the recognition of the COVID-19 pandemic) until early/mid-2020, Dr. Bility developed a hypothesis consistent with his previous work, which posited that the emerging lung disease, subsequently termed COVID-19, was predominately mediated by serpentinization-driven magnetic catalysis of aberrant chiral biomolecules (including the SARS-CoV-2); albeit SARS-CoV-2 is transmissible. Consistent with Dr. Bility's hypothesis, he argued in pre-prints on the ResearchGate website (https://www.researchgate.net/profile/Moses-Bility), within departmental communications (via emails) and via zoom calls with renowned experts in spin chemistry and hydrogeology at the University of Pittsburgh that COVID-19 would disproportionally affect countries in the Americas (including the United States) and Europe (Western Eurasia), in contrast to the dominant paradigm, which was that countries in Africa would have the highest disease burden. Furthermore, he argued in those pre-prints and avenues that the COVID-19 pandemic is governed by the Sun's and Earth's magnetic field activity and terrestrial water dynamics in the major drainage basins; thus, it will oscillate semi-annually (~6 month wavelength), with high cases/deaths in the spring and fall, and low cases/deaths around summer and winter, in synchrony with the solar cycle and the geomagnetic field activity and terrestrial water dynamics in the drainage basins. He also linked an emerging lung disease in his animal colony research, which began in the fall of 2019 and proceeded until the onset of COVID-19, demonstrating the presence of SARS-CoV-2-related antigens in the diseased animals.

18.     Based on his research as detailed in paragraph 17 above, Dr. Bility submitted an article in June 2020, which after 4 months of peer review by subject-matter experts, was accepted and published in October 2020 in a high impact, peer-review journal (Science of the Total Environment; Bility MT et al. 2020). Dr. Bility subsequently withdrew the article on November 02, 2020 due to the following violent threats, racial abuse and harassing actions directed at Dr. Bility and his colleagues, some by members of the School of Public Health:

a.     Dr. Bility's office area was vandalized. The name tag on Dr. Bility's office wall was ripped off and thrown across the floor on multiple occasions.

b.     Dr. Kenneth W. Witwer (a white faculty at John Hopkins University) contacted Drs. Jean Nachega and Yue Chen (colleagues who assisted Dr. Bility with his work) via an email on October 30, 2020 and informed them that he had contacted Defendant Pitt administrators (Dr. Anne B. Newman, former Chair of Epidemiology, School of Public Health and others) about the article and instructed them to retract the article immediately.

c.     Subsequently, Dr. Nachega informed Dr. Bility via a phone conversation that Dr. Nachega's research funding was threatened to be withheld if the article was not withdrawn.

d.     Dr. Bility was also informed by his former chair, Dr. Rinaldo, that Dr. Witwer also contacted him and advocated punitive actions against Dr. Bility; Dr. Rinaldo stated to Dr. Bility via a Zoom conference call that he informed Dr. Witwer that Dr. Bility had the right to academic freedom like all faculty in academia.

e.     At the same time, Dr. Rinaldo told Dr. Bility through emails and phone conversations that unnamed senior officials in the School of Public Health, Defendant Pitt Health Sciences, and Defendant Pitt's Provost office expressed displeasure about the article. Dr. Rinaldo stated to Dr. Bility that he informed Defendant Pitt officials that Dr. Bility had the right to

academic freedom like all faculty at Defendant Pitt. The unnamed senior officials in the School of Public Health, Defendant Pitt Health Sciences, and Defendant Pitt's Provost Office requested Dr. Rinaldo to investigate Dr. Bility and the work in question.

    f.  Dr. Rinaldo subsequently conducted the investigation and found that Dr. Bility did not violate any academic integrity standard. The findings were shared in a public forum via Zoom on November 12, 2020, at which time students in Defendant Pitt's School of Public Health called Dr. Bility derogatory names, such as stupid, retarded, unintelligent, etc. After the Zoom meeting, three individuals (a student, a staff member, and a faculty member) who witnessed the abuse sent Dr. Bility emails, expressing their concern about his well-being due to the abuse and apologizing for the abusive treatment he had received.

    g.  Prior to and after that meeting, Dr. Bility received two racially derogatory emails from anonymous individuals who Dr. Bility assumes came from the Defendant Pitt community. The first was an email dated November 7, 2020 regarding "Exam grade" and stated, "Dear Mr. Bility, I'd like to inquire about your nigger science from Chinese voodoo. I've got a master boner that I can't get rid of. If I pray to LeBrown James Junior with some magic crystals surrounding me will it go away? I'll thank from the bottom of my heart if you can answer to the best of your a(bility)s." The second email dated November 14, 2020 on the subject, "DAMN NIGGA U STUPID," stated "FUCK YOU AND YOUR BAD STUDIES. Except of course this was a post-ironic article, if that was so-respect!"

    h.  In the Fall of 2020, Dr. Bility was in the process of transferring his research lab to the Hillman Cancer Center (a Defendant Pitt Health Sciences affiliate) and was slated to receive a substantial research funding (~500,000 US dollars) and increased compensation (~20,000 US dollars bonus per year; ~130,000 US dollars compensation) for his move to the Hillman Cancer

Center. The Hillman Cancer Center's director, Dr. Ferris (Associate Vice Chancellor for Cancer Research, Defendant Pitt Health Sciences), made a verbal offer to Dr. Bility, and Dr. Bility accepted the offer and informed his chair, Dr. Rinaldo via email communications. Thus, the only record of the transfer are the email communications from Hillman Cancer Center requesting the transfer of Dr. Bility's grants from the School of Public Health and email communications regarding the move with Dr. Rinaldo, Dr. Ferris, and another Defendant Pitt faculty. On December 21, 2020, Dr. Bility was informed (via a zoom call) by Dr. Robber Ferris, the Director of the Hillman Cancer Center and the Associate Vice Chancellor for Cancer Research, Defendant Pitt Health Sciences, that he was instructed by an unnamed powerful individual in the Defendant Pitt Health Sciences not to allow Dr. Bility to move to the center. Dr. Ferris offered Dr. Bility an opportunity that if he apologized for engaging in the research in question, the powerful individual in the Defendant Pitt Health Sciences might reconsider the decision to block the transfer; Dr. Bility refused to apologize. Dr. Bility refused to apologize after Dr. Ferris could not tell him which academic integrity standards or Defendant Pitt policies he had violated. Dr. Bility's move was blocked despite Dr. Rinaldo informing Dr. Ferris that Dr. Bility had done nothing wrong.

19.    Upon information and belief, the actions taken by members of the School of Public Health as described in described in paragraph 18a – i above were done as part of a pattern to continue placing Dr. Bility in a racially hostile work environment. Defendants have not harassed or threatened similarly situated non-Black professors who engaged and/or published research that challenged the dominant paradigm.

20.    Dr. Bility complained to Defendant Pitt (specifically, Eleanor Feingold, Executive Associate Dean, School of Public Health) and Defendant Pitt Police about the racist and derogatory emails, but Defendant Pitt did not investigate his complaint, and nothing was done to determine

who sent these emails. Dr. Bility was informed by the Defendant Pitt police that he should expect such a response if he publishes controversial work.

21.     Incidentally, Dr. Bility's predictions in his article have been validated, as the COVID-19 pandemic has been more severe in the Americas (including the United States) and Europe (Western Eurasia), and COVID-19 deaths (and cases) have oscillated semi-annually, with highs in the spring and fall, in synchrony with geomagnetic activity.

22.     Dr. Bility did not file a complaint against Defendant Burke to his direct supervisor Dean Arthur Levine (the Senior Vice Chancellor of Defendant Pitt Health Sciences) or other Defendant Pitt senior officials in 2019 because he was afraid of retaliation. However, he did make a record of the February 13, 2019 meeting by sending a confidential email to Dr. Nobel Maseru, the Associate Dean of Diversity in the School of Public Health, dated February 15, 2019, detailing the communications from Defendant Burke and describing the meeting Dr. Bility felt compelled to attend. In this email, Dr. Bility stated his belief that Defendant Burke abused his power and stated that Dr. Bility certainly did not want to present his ideas and data to Defendant Burke, as his research overlaps with Dr. Bility's work. Finally, Dr. Bility stated in the email that he believed Defendant Burke thought he could bully Dr. Bility because of the color of his skin, and he found it very hard to believe that Defendant Burke drags white faculty members in his office to justify why they are giving talks at workshops. In the email to Dr. Maseru in 2019, Dr. Bility expressed concerns about retaliation if he files a complaint against Defendant Burke. In 2020, Dr. Bility did inform the interim Dean of the School of Public Health (Interim Dean Everette James) via an email about the incident with Defendant Burke in 2019.

23.     On November 28, 2021, Dr. Bility learned from a colleague that Defendant Burke plagiarized his work in a medRxiv preprint article "Recurring Spatiotemporal Patterns of COVID-

19 in the United States" (doi: https://doi.org/10.1101/2021.11.23.21266775) and took his ideas

without giving him any credit for the same. The colleague was familiar with Dr. Bility's work and

had the requisite training in physics, chemistry, and biology to detect the plagiarism.

24.     Accordingly, on December 19, 2021, Dr. Bility sent a letter to Vice Provost Lu-in

Wang (Vice Provost for Faculty Affairs, Office of the Provost) raising his concerns that Defendant

Burke had plagiarized his work and stolen his ideas. In the letter, Dr. Bility stated, among other

things, as follows:

    a. I believe Defendant Burke was aware of my STOTEN article and my ideas on predicting the spatial-temporal dynamics of the COVID-19 pandemic. I also think he was consulted by the senior leadership of GSPH during their deliberations on the uproar surrounding my STOTEN article. Additionally, he had intimate knowledge of the theoretical concepts underpinning my work, as he previously forced me (via a ruse) to discuss my work with him in a meeting and attempted to force me to not discuss my work in public. I believe Defendant Burke harassed me because I'm a Black faculty; I reported this matter to the university, but I declined to submit a formal complaint.

    b. The development of a long-term prediction framework of the spatial-temporal dynamics of the COVID-19 pandemic is an intractable problem in the field. I believe Defendant Burke knowingly repackaged my ideas and prediction framework as evident by his inability to provide a mechanism that governs the findings in his article. Attached is a detailed analysis of the similarity between the assumptions, findings, and prediction framework between both articles. [not attached]. Additionally, the tactic Defendant Burke used to repackage my ideas was the same approach he previously proposed to me in the 2019 meeting.

    c. The findings in Defendant Burke's article are not a manifestation of serendipitous data analysis. He made underlining assumptions in his data analysis that are highly unusual and improbable, and can only be obtained from my work. Per academic integrity and plagiarism standards at Defendant Pitt, the use of ideas and findings from others in whole or part as the basis for research must be acknowledged. It is clear that I was the first to express the ideas and findings that formed the core of Defendant Burke's article (kindly see the attached comparative analysis and the highlighted sections in his article and my STOTEN article).

    d. Throughout our nation's history, Black scientists and innovators have been denied credit for their innovations and ideas, with many instances of others taking those same innovations and ideas and falsely presenting them as their own. This practice has had a detrimental impact on Black scientists and

innovators. I believe Defendant Burke demeaned and harassed me in 2019 for this very line of research because I'm a Black faculty. He is plagiarizing my work because of the long history of tolerance of such abusive and dehumanizing behavior towards Black scientists within our society. I'm kindly requesting that the University of Defendant Pittsburgh investigate this matter and address it in a fair and impartial manner per university regulations, policies, and guidelines.

25.     Vice Provost Wang responded to Dr. Bility's letter by submitting the complaint and related documents to Dr. Craig Wilcox, University Research Integrity Officer. Drs. Craig Wilcox and Mara Horwitz (Deputy Research Integrity Officer) subsequently met with Dr. Bility and Dr. Wilcox requested that Dr. Bility resubmit his plagiarism complaint against Defendant Burke, but to remove any direct reference that his conduct was due to Dr. Bility's race.

26.     Accordingly, Dr. Bility resubmitted his plagiarism complaint against Defendant Burke by sending a letter dated January 13, 2022 to Dr. Craig Wilcox, University Research Integrity Officer. Though he removed some references to race as being the direct reason for Dr. Burke's actions against him, Dr. Bility still referenced his belief that Defendant Burke was plagiarizing his work due to the "long history of tolerance of such abusive and dehumanizing behavior toward Black innovators in the arts, science and medicine within our society."

27.     In response to the complaint, Defendant Pitt formed a three-member inquiry panel to conduct an investigation and provide a report and recommendations. Defendant Pitt chose Dr. Jane Cauley (Interim chair and faculty member, Department of Epidemiology, Defendant Pitt School of Public Health), Dr. Doug Reed (a faculty member in Defendant Pitt Health Sciences Center for Vaccine Research), and Dr. Julie Fiez (a faculty member in the Department of Developmental Psychology, Defendant Pitt's School of Arts and Sciences) to serve on the inquiry panel. Dr. Cauley was the chair. The inquiry panel unanimously found that the allegations did not have sufficient substance to warrant a formal investigation.

28.     On July 14, 2022, Dr. Wilcox informed Dr. Bility that Dean Kathleen Blee (Defendant Pitt's School of Arts and Sciences) accepted the findings of the inquiry panel and officially closed the matter.

29.     Dr. Bility subsequently learned that Drs. Wilcox, Horwitz, Cauley, Reed, and Dean Kathleen Blee withheld information regarding Defendant Pitt's own financial conflict of interest between Defendant Pitt and Defendant Burke's start-up company (a Defendant Pitt spinout that uses Defendant Pitt-licensed intellectual property), Epistemix, Inc., which used Dr. Bility's COVID-19-spatiotemporal dynamics prediction framework to raise approximately 5 million US dollars from investors.

30.     Dr. Bility also learned that two of the members of the inquiry panel who decided that his complaint against Defendant Burke was unfounded, Drs. Cauley and Reed, have a close personal friendship with Defendant Burke. For the reasons set forth in paragraphs 27-28, the individuals selected to sit on the inquiry panel had a conflict of interest, and Defendant Pitt violated its own rules and procedures as a result.

31.     Upon information and belief, Defendant Burke was biased against Black people. For most of Defendant Burke's tenure, he kept a bust of Dr. Thomas Parran, who oversaw the Tuskegee syphilis study that intentionally infected Blacks with syphilis and withheld proven treatments. The bust was only removed after Dr. Maseru and some students protested against Defendant Burke having it in his office.

32.     Dr. Bility also was subjected to a racially hostile work environment through the conduct of the current dean in the School of Public Health, Dean Maureen Lichtveld ("Defendant Lichtveld"), as set forth in detail below.

33.     On January 1, 2021, Defendant Lichtveld became the new Dean of the School of Public Health following the retirement of Defendant Burke.

34.     On August 27, 2021, Dr. Bility received an email from Defendant Lichtveld, "Hi Moses, SVC Shekhar was contacted by NIH to remove the acknowledgement to the D43 since Velpandi's student was not funded to conduct the research published. They also asked to remove the acknowledgement to NIAID [Dr. Bility's NAID-R21 Grant, which involved fetal tissue research] since there is no direct connection. Please request that the journal remove both acknowledgements asap. Copy me on that request. SVC Shekhar asked me to keep him informed."

35.     Dr. Bility was very concerned about the second request to remove his NIAID funding reference from the Scientific Reports article. Specifically, he doubted the statement that the NIH has asked to remove the acknowledgment to NIAID since there is no direct connection, for the following reasons: a. The NIAID program officer previously accepted the final progress report, including the Scientific Reports article and did not contact Dr. Bility about the request, per NIH rules; and b. Dr. Bility received no communication from Defendant Pitt's Office of Research, the University's unit authorized to oversee funded-research compliance.

36.     Dr. Bility subsequently requested confirmation of the NIH's "alleged" request to the Office of the SVC for the Health Sciences. To date, he has received no response from the SVC for the Health Sciences and the NIH either confirming or denying the NIH's alleged request to remove reference to his NIAID grant from the Scientific Reports article.

37.     On September 13, 2021, based on the facts described in paragraphs 32-35 above, Dr. Bility filed a formal complaint with Defendant Pitt against Defendant Lichtveld for discriminating against him because of his race, African-American. In the complaint, Dr. Bility stated his belief that Defendant Lichtveld exploited a request from a NIH official to Dr. Velpandi

Ayyavoo (the PI on the D43TW010039 training grant) to remove reference in the article to that grant to fabricate the second request in a premeditated attempt to have Dr. Bility commit a federal crime, namely, defrauding the federal government. The federal government requires that federal funding be acknowledged on work (including research articles) supported by the NIH. As the corresponding Principal Investigator on the NIAID grant, Dr. Bility bears responsibility for matters concerning the grant. Defendant Lichtveld understood that the federal government could prosecute Dr. Bility for defrauding the federal government (per 18 U.S.C. § 371) if he had proceeded to remove the NIAID acknowledgement and subsequently altered the progress reports to reconcile his actions.

38.     Defendant Lichtveld's actions threatened Dr. Bility's freedom and adversely affected his health and well-being.

39.     Indeed, this was the second occasion Defendant Lichtveld harassed and discriminated against Dr. Bility while using fetal tissue research as a cover. Early in 2021, Defendant Lichtveld called a meeting that included Dr. Bility's former chair, Dr. Rinaldo. Defendant Lichtveld commented that she was informed that Dr. Bility did not have the approval to use fetal tissues from Advanced Bioscience Resources (ABR) in his research, per communications she had with the Office of Research Protections (ORP). After Dr. Bility provided her with his IRB approval, she stated that she would contact him later. She never did.

40.     Many non-Black faculty members in the School of Public Health, as well as the University generally, perform research involving fetal tissues obtained from elective abortion, and Dr. Bility is the only Black faculty whose research involves fetal tissue obtained from elective abortion. Defendant Lichtveld has not targeted those non-Black faculty for harassment and discrimination because they use fetal tissue obtained from elective abortion in their research.

41.     Defendant Lichtveld subjected Dr. Bility to a hostile work environment via the actions described above. Upon information and belief, her actions stem from the belief that a Black scientist should not engage in scholarly activities that challenge the scientific paradigm established by non-Black scientists. Upon information and belief, Dr. Bility's scholarly activities as a Black faculty member, including investigating the weakening geomagnetic field, changes in Earth's environment/hydroclimate, and human health, triggered this harassment and discrimination. Indeed, non-Black scientists from other major universities have been investigating the links between a weakening geomagnetic field, changes in Earth's environment/hydroclimate and human health, and making arguments in renowned journals (i.e., Alan Cooper et al., A global environmental crisis 42,000 years ago. Science 371, 811-818 (2021)) that challenge the dominant paradigm. These non-Black scientists have been hailed as maverick scientists, critical thinkers, pioneers, and innovators challenging the current understanding of our planet and indigenous practices. Within the School of Public Health and across the University, Defendant Lichtveld has championed efforts to investigate the links between environmental/hydroclimate change and human health. Therefore, by process of elimination, it is not the content of Dr. Bility's work or the use of fetal tissues that Defendant Lichtveld and others in the School of Public Health and Defendant Pitt find offensive, but that he is a Black/African American person engaging in intellectual pursuits that challenge foundational concepts/ideas developed by non-Black individuals.

42.     Dr. Bility concluded his complaint to Defendant Pitt by stating that Defendant Lichtveld's actions violate the University of Defendant Pittsburgh anti-harassment and anti-discrimination policies, and his civil rights, and that the Civil Rights Act was enacted in part due to harassment and discrimination against Blacks/African Americans who attempted to pursue

16

intellectual endeavors at academic institutions. He also stated his belief that he was being attacked by Defendant Lichtveld simply because he is a Black person who believes he has the right to think independently and develop novel ideas that could shape the intellectual discourse and public health beyond matters affecting only Black people.

43.    During the brief inquiry of Dr. Bility's complaint against Dr. Lichtveld performed by Defendant Pitt, and specifically, Assistant Vice Chancellor Laurel Gift, Defendant Pitt's Office of Compliance, Investigations & Ethics, only then did Defendant Lichtveld reverse course, admit her error, and claim that the entire issue with Dr. Bility was a miscommunication. In that vein, Defendant Lichtveld sent Dr. Bility an email on April 7, 2022, stating that her previous email to him which started this whole ordeal simply was a miscommunication.

44.    Instead of conducting an investigation of Dr. Bility's discrimination complaint against Dr. Lichtveld, Defendant Pitt took almost eight months to do an "inquiry" and reach the conclusion that his complaint had no merit, and a full investigation was unwarranted. Defendant Pitt (specifically, Katie Pope, Defendant Pitt's Associate Vice Chancellor for Civil Rights and Title IX) responded around the time Dr. Bility contacted the NIH, which has a 4-week deadline for Defendant Pitt to response. Dr. Bility received correspondence from Defendant Pitt on April 11, 2022, detailing these findings and closing the case.

45.    On June 20, 2022, Dr Bility appealed Defendant Pitt's finding and presented new evidence in the form that he recently learned that Defendant Burke mentored Defendant Lichtveld on a regular basis and had an additional motive to tarnish his reputation and enable her mentor, Defendant Burke, to publish his plagiarized work in a peer-review journal without worrying about a plagiarism complaint from Dr. Bility. On July 7, 2022, his appeal was denied by Provost Ann Cudd via email communication.

17

46.     In retaliation for Dr. Bility's complaints to Defendant Pitt of race discrimination, in April 2021, Defendant Pitt appointed Dr. Jessica Burke ("Dr. Burke"), daughter of Defendant Burke and a faculty in the Department of Behavior and Community Health Sciences, and the Vice Dean of Defendant Pitt School of Public Health, to be the interim chair of Dr. Bility's department (Infectious Diseases and Microbiology) following the resignation of Dr. Charles Rinaldo. Defendant Pitt did so to intimidate Dr. Bility, as Dr. Burke became his immediate supervisor during a time that Dr. Bility had accused her father of discriminating against him due to his race.

47.     Additionally, Defendant Lichtveld retaliated against Dr. Bility on April 22-26, 2022, by blocking teaching and research supervision opportunities.

48.     Defendant Pitt has further retaliated against Dr. Bility by not adhering to its own time guidelines in his tenure review process and holding up the process and insisting that Dr. Burke serve as an author of the chair's letter of recommendation, despite her conflict of interest. Prior to Dr. Bility submitting his tenure dossier to Dr. Burke, and the School of Public Health for review, Dr. Bility contacted Defendant Pitt's Provost Office via email on April 11, 2022, and pointed out that there was a significant conflict of interest regarding his tenure review. Defendant Pitt's Provost Office did not take any action to address the conflict of interest.

49.     As a result of all the conduct of Defendants as set forth above, Dr. Bility has suffered embarrassment, substantial mental anguish and emotional distress, and loss of wages and potential earnings. The discrimination has affected his family, including his wife and children, who have been deprived of receiving his best care and attention due to him coping with Defendants' discriminatory conduct.

## V.      CLAIMS FOR RELIEF

### COUNT I – VIOLATION OF TITLE VII –RACIALLY HOSTILE WORK ENVIRONMENT, PLAINTIFF v. DEFENDANT PITT

50.      Plaintiff incorporates by reference the averments contained in all preceding paragraphs as if fully set forth herein.

51.      Defendant Pitt has intentionally and willfully engaged in a series of unlawful acts, practices, policies, and/or procedures in discriminating against Plaintiff with respect to compensation, terms, conditions, or privileges of employment in violation Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1).

52.      Defendant Pitt subjected Plaintiff to a pervasive hostile work environment, which was induced by its intent to discriminate against Plaintiff on the basis of his race, African American, as evidenced by its actions as set forth above. Defendant Pitt's actions against Plaintiff over a period of years was part of a pattern creating a racially hostile environment for Plaintiff.

53.      Plaintiff has been directly harmed because of Defendant Pitt's violation as is fully set forth above.

### COUNT II -- VIOLATION OF TITLE VII – RETALIATION, PLAINTIFF v. DEFENDANT PITT

54.      Plaintiff incorporates by reference the averments contained in all preceding paragraphs as if fully set forth herein.

55.      Defendant Pitt has intentionally and willfully engaged in a series of unlawful acts, practices, policies, and/or procedures in discriminating against Plaintiff with respect to compensation, terms, conditions, or privileges of employment in violation Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a).

56.     Defendant Pitt retaliated against Plaintiff by taking actions against Plaintiff as described above because of his prior complaints of race discrimination against Defendant Burke and Defendant Lichtveld as set forth above.

57.     Plaintiff has been directly harmed because of Defendant Pitt's violation as is fully set forth above.

## COUNT III – 42 U.S.C. 1983 VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT, PLAINTIFF v. DEFENDANTS BURKE AND LICHTVELD

58.     Plaintiff incorporates by reference the averments contained in all preceding paragraphs as if fully set forth herein.

59.     Defendants Burke and Lichtveld, in their individual capacities and acting under color of state law, have denied Plaintiff equal rights under the Fourteenth Amendment as detailed herein.

60.     Defendants Burke and Lichtveld have engaged in direct discrimination based upon race against Plaintiff.

61.     Defendants Burke and Lichtveld pretextually effectively punished Plaintiff and denied him opportunities for no reason and when similarly placed Caucasian employees are not punished and denied opportunities.

62.     Defendants Burke and Lichtveld have failed to act despite meritorious complaints that have been brought to Defendants Burke and Lichtveld by Plaintiff.

63.     Defendants Burke and Lichtveld have engaged in a continuing violation of Plaintiff's Equal Protection rights.

64.     Plaintiff should, therefore, be compensated to redress the Constitutional violating actions of Defendants Burke and Lichtveld.

20

## COUNT IV – 42 U.S.C. § 1981 THROUGH 42 U.S.C. § 1983 EQUAL PROTECTION CLAUSE VIOLATION OF THE FOURTEENTH AMENDMENT BY PLAINTIFF AND AGAINST ALL DEFENDANTS

65.      Plaintiff incorporates by reference the averments contained in all preceding paragraphs as if fully set forth herein.

66.      All Defendants, through their racist individual actions and knowing and purposeful failure to take corrective remedial action, have denied African-American Plaintiff the security of persons and property as is enjoyed by Caucasian employees at Defendant Pitt.

67.      Plaintiff should, therefore, be compensated for all Defendants' violation of 42 U.S.C. § 1981.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Honorable Court will:

(a)      Assume jurisdiction herein;

(b)      Declare Defendants' conduct to be unlawful and an intentional violation of Plaintiff's rights;

(c)      Award Plaintiff wage loss damages, including back pay, front pay, and lost future earnings, damages associated with the increased tax burden of any award, and lost fringe and other benefits of employment, including health, dental, and vision benefits;

(d)      Award Plaintiff compensatory and punitive damages against Defendants;

(e)      Award Plaintiff pre and post-judgment interest;

(g)      Award Plaintiff costs and attorneys' fees under all counts; and

(h)      Grant such other relief as the Court deems just and appropriate.

## Demand for Jury Trial

Plaintiff hereby demands a jury trial.

Respectfully submitted,

**O'HANLON SCHAWARTZ, P.C.**

STEPHEN T. O'HANLON, ESQUIRE

DATE: May 10, 2023

**O'HANLON SCHWARTZ, P.C.**
BY:   Stephen T. O'Hanlon, Esquire (PA Bar # 208428)
Attorneys for Plaintiff
2 Penn Center, Suite 1410
1500 John F. Kennedy Boulevard
Philadelphia, PA 19102
Tel:  (267) 546-9066
Fax: (215) 563-6617
steve@ohanlonschwartz.com