**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**PITTSBURGH**

MOSES T. BILITY, PHD;        )
        )
        Plaintiff,        )        2:23-CV-00770-MJH
        )
        )
        vs.        )
        )
UNIVERSITY OF PITTSBURGH, DEAN  )
DONALD BURKE, DEAN MAUREEN    )
LICHTVELD,        )

        Defendants.

**<u>MEMORANDUM OPINION</u>**

Plaintiff, Moses T. Bility, filed the present lawsuit against Defendants, University of Pittsburgh, Dean Donald Burke, and Dean Maureen Litchtveld on May 10, 2023. (ECF No. 1). Dr. Bility filed an Amended Complaint on July 3, 2023. (ECF No. 9). The Amended Complaint alleges claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1983, and 42 U.S.C. §1981. (ECF No. 9). Presently, before the Court, is Defendants' Motion to Dismiss Dr. Bility's Amended Complaint. (ECF No. 21). The Motion to Dismiss has been fully briefed and is ripe for decision.

For the reasons below, Defendants' Motion to Dismiss will be granted as to all counts.

### I.    Statement of Facts

In 2015, Dr. Bility began working at the University of Pittsburgh ("the University") as an Assistant Professor at the School of Public Health in the Department of Infectious Diseases and Microbiology. (ECF No. 9, at ¶ 9). In 2019, he was invited to make a presentation at the Global

1

Health and Inequities and Infectious Disease Workshop regarding his research on geomagnetic fields. (*Id.* ¶ 12). In 2019, before Dr. Bility presented his research, Dr. Burke, then the Dean of the School of Public Health, asked to meet with Dr. Bility to discuss his research. (*Id.* ¶ 13). This meeting occurred on February 13, 2019. (*Id.* ¶ 24). Dr. Bility alleges that at the meeting, Dr. Donald Burke "told [him] several times that he had nothing to contribute and tried to persuade him not to present his groundbreaking research and give up pursuing the research." (*Id.* ¶ 14). After the meeting, on February 13, 2019, Dr. Bility sent a confidential email to Dr. Nobel Maseru, the Associate Dean of Diversity in the School of Public Health, detailing the meeting and alleging that Dr. Donald Burke thought he could bully Dr. Bility into not giving his presentation because he is Black. (*Id.* ¶ 24).  Dr. Bility gave the presentation on April 12, 2019. (*Id.* ¶17).

In October 2020, Dr. Bility published an article that discussed his research and its relation to COVID-19 in a peer reviewed journal titled *Science of the Total Environment*. (*Id.* ¶ 20). As a result of the publication, Dr. Bility alleges that a series of events took place: someone vandalized his office by throwing his name tag and tampering with his ceiling (*Id.* ¶ 20(a)), a professor from John Hopkins University allegedly instructed the University to remove Dr. Bility's article from publication (*Id.* ¶ 20(b)), and "unnamed senior officials" expressed displeasure about the article. (*Id.* ¶ 20 (e)). Dr. Bility further alleges that students called him derogatory names at a Zoom conference. (*Id.* ¶ 20). Moreover, Dr. Bility received two racially derogatory emails from "anonymous individuals who [he] assumes came from the Defendant Pitt Community." (*Id.* ¶ 20 (g)). Dr. Bility claims that he reported these emails to the University through Eleanor Feingold, Executive Associate Dean of the School of Public Health, as well as the University Police, and no investigation was carried out. (*Id.*). He also alleges that the University Police told him that

"he should expect such a response if he publishes controversial work." (*Id.* ¶ 22). Dr. Bility removed his COVID-19 article from publication on November 2, 2020.

In the fall of 2020, Dr. Bility was transferring his research lab to the Hillman Cancer Center when the director of the research center informed him that "an unnamed powerful individual in the Defendant Pitt Health Sciences did not allow Dr. Bility to move to the center." (*Id.* ¶ 20(h)).

On January 1, 2021, Dr. Maureen Lichtveld ("Dr. Lichtveld") became the Dean of the School of Public Health after Dr. Donald Burke retired. (*Id.* ¶ 35). Early in 2021, in a meeting called by Dr. Lichtveld, she informed Dr. Bility that he did not have the proper approvals to receive fetal tissues for his research from Advanced Bioscience Resources ("ABR"). (*Id.* ¶ 42). Dr. Bility claims that he subsequently provided the required approvals to Dr. Lichtveld, but she did not respond. (*Id.*) Dr. Bility alleges that Dr. Lichtveld later prohibited him from receiving fetal tissues from ABR. (*Id.* ¶ 51).

In April 2021, the University appointed Dr. Jessica Burke, daughter of Dr. Donald Burke and Vice Dean of the Pitt School of Public Health, as the interim chair of Dr. Bility's department at the school. (*Id.* ¶ 49).

On August 27, 2021, Dean Lichtveld emailed Dr. Bility, informing him that the National Institute of Health ("NIH") wanted him to remove acknowledgments to two grants from the COVID-19 article. (*Id.* ¶36). Concerned about the repercussions of removing the acknowledgments, and the possibility that their absence from the article would violate the law, Dr. Bility requested confirmation that the NIH reached out to Dr. Lichtveld and directed her to get Dr. Bility to remove the acknowledgments. (*Id.* ¶ 38). After requesting this confirmation, on September 13, 2021, Dr. Bility filed a formal complaint against the University and Dr. Lichtveld

for race discrimination. (*Id.* ¶ 40). As a result of this complaint, the University conducted an eight-month "inquiry," after which, they concluded that Dr. Bility's complaint "had no merit, and a full investigation was unwarranted." (*Id.* ¶ 47). On April 7, 2022, during those eight months, Dr. Lichtveld emailed Dr. Bility and informed him that her original request to remove the acknowledgment was a mistake and that the entire situation was a misunderstanding. (*Id.* ¶ 46).

On November 28, 2021, Dr. Bility alleges that a colleague informed him that Dr. Donald Burke plagiarized his work. (*Id.* at 25). In response, Dr. Bility brought a formal complaint in a letter to Vice Provost Lu-in Wang, who forwarded the complaint to Dr. Wilcox, a University Research Integrity Officer. (*Id.* ¶ 26). A three-person University inquiry panel was created to investigate the alleged plagiarism. (*Id.* at 29). Dr. Jane Cauley, Dr. Doug Reed, and Dr. Julie Fiez were selected to serve on the panel. (*Id.*). The panel unanimously found that the plagiarism allegations lacked sufficient substance to warrant a formal investigation. (*Id*). In the Amended Complaint, Dr. Bility alleges that two of the panel members, Drs. Cauley and Reed, have a close friendship with Dr. Donald Burke so their selection violates University policy. (*Id.* at 32). Dr. Bility avers that the University chose the panel members because Dr. Donald Burke is White, and Dr. Bility is Black. (*Id.* ¶ 32).

In April 2022, Dr. Bility alleges that Dr. Lichtveld "blocked" him from mentoring and giving a research presentation to a group of high school students during a summer program. (*Id.* ¶ 50). Dr. Bility claims that he accepted the invitation to serve as a mentor to the students, but Dr. Lichtveld insisted that she would mentor the students instead. (*Id.* at 50).

Also in April 2022, Dr. Bility alleges that the University mishandled his tenure application process by slowing up the process, not adhering to established policy, and insisting that Dr.

4

Jessica Burke author his letter of recommendation for tenure. (*Id.* ¶52). The University denied Dr. Bility's application for tenure in June 2023. (*Id.*). Dr. Bility avers that the tenure denial is retaliation for his race discrimination claims and because he challenged the "racial hierarchal system" at the University. (*Id.*).

Dr. Bility alleges that he has suffered embarrassment, substantial mental anguish, emotional distress, and loss of wages and potential earnings. (*Id.* ¶ 53). Dr. Bility further alleges that the discrimination has affected his family who have been deprived of receiving his care and attention because he has been coping with the discrimination by the Defendants. (*Id.*)

## II.     Relevant Legal Standards

When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Eid v. Thompson*, 740 F.3d 118, 122 (3d Cir. 2014) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The Supreme Court clarified that this plausibility standard should not be conflated with a higher probability standard. *Iqbal*, 556 U.S. at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556); *see also Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 147 (3d Cir. 2014). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." *Iqbal*, 556 U.S. at 678. "Factual allegations of a complaint must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. A pleading party need not establish the elements of a *prima facie* case at this stage; the party must only "put forth allegations that 'raise a reasonable expectation that discovery will reveal evidence of the necessary element[s].'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009) (quoting *Graff v. Subbiah Cardiology Assocs., Ltd.*, 2008 WL 2312671 (W.D. Pa. June 4, 2008)); *see also Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016). Nonetheless, a court need not credit bald assertions, unwarranted inferences, or legal conclusions cast in the form of factual averments. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 n.8 (3d Cir. 1997). The primary question in deciding a motion to dismiss is not whether the plaintiff will ultimately prevail, but rather whether he or she is entitled to offer evidence to establish the facts alleged in the complaint. *Maio v. Aetna*, 221 F.3d 472, 482 (3d Cir. 2000). The purpose of a motion to dismiss is to "streamline[] litigation by dispensing with needless discovery and factfinding." *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989).

Furthermore, "in evaluating a motion to dismiss, courts are not limited to the complaint, but may also consider evidence integral to or explicitly relied upon therein." *Tanksley v. Daniels*, 902 F.3d 165, 172 (3d Cir. 2018) (internal quotations omitted). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (citation omitted).

In a civil rights case, when the court grants a motion to dismiss for a failure to state a claim, the court must offer the plaintiff leave to amend, even if it was not requested by the plaintiff,

"unless doing so would be inequitable or futile." *Phillips*, 515 F.3d at 246; *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251 (3d Cir. 2007).

### III.   Discussion
#### A.  Count I - Title VII Hostile Work Environment Claim

Dr. Bility brings a Title VII Hostile Work Environment claim against the University. The University argues that Dr. Bility fails to allege intentional discrimination as well as pervasive or severe discrimination in the Amended Complaint. (ECF. No. 22, at 14). Plaintiff, Dr. Bility, argues that the University intentionally subjected him to a pervasive and constant hostile work environment based on his race. (ECF No. 9, at ¶ 56).

To establish a prima facie case of hostile work environment, a plaintiff must show: "(1) that he suffered intentional discrimination because of his race or national origin; (2) that the discrimination was severe and pervasive; (3) that the discrimination detrimentally affected him; (4) that the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability." *Sanchez v. SunGard Availability Servs. LP*, 362 F. App'x 283, 286 (3d Cir. 2010). In conducting this analysis, courts must evaluate all the circumstances, including, "the frequency of the conduct, the severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance." *Id.* at 287 (citing *Harris v. Forklift Sys.*, *Inc.*, 510 U.S. 17, 23). Further, Title VII "protects a plaintiff only as to harassment based on discrimination against a protected class." *Ullrich v. United States Secy. Of Veterans Affairs*, 457 Fed. Appx. 132, 140 (3d. Cir. 2012). "Many may suffer severe or pervasive harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief." *Id.* (internal quotation marks and citations omitted). Title VII is not a "general civility code" and

"forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment." *Onacle v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998).

In his Amended Complaint, Dr. Bility alleges that he was discriminated against because of his race on various occasions. But there are only two alleged times when he was explicitly discriminated against because of his race, these being the two derogatory emails sent to him in November 2020, by two anonymous individuals. (ECF No. 9, at ¶ 26(g)). To attribute liability for a hostile work environment to a defendant under Title VII, a plaintiff must prove the existence of respondeat superior liability to the employer.[1] Here, although the emails were abhorrent, Dr. Bility pleads that he "assum[ed]" the emails came from the University community. *Id.* An assumption that the emails came from the University community is not enough to induce employer liability. Dr. Bility fails to allege that the emails came from a supervisor or one of his co-workers. Dr. Bility even fails to definitively allege that a specific individual in the University community sent the emails, he just "assumes" that is the case. Thus, Dr. Bility does not sufficiently plead that the University had a high degree of control over the email behavior.

Along with the emails that were sent, Dr. Bility alleges a list of other events, that occurred between 2019 and 2021, in support of his hostile work environment claim. Unlike the

---

[1] Employer liability is typically reserved to instances in which a supervisor or co-worker are the perpetrators of discriminatory actions. *See Huston v. P&G Paper Prods. Corp.*, 568 F.3d 100, 104-05 (3d Cir. 2009). If a hostile work environment is created by a supervisor, the employer is subject to vicarious liability. *Id.* If the discrimination is by a co-worker, the employer could be found liable for negligently failing to discover the discrimination or failing to respond to the harassment. *Id.* Courts have applied this co-worker negligence theory to discrimination by third parties. *See Freeman v. Dal-Tile Corp.*, 750 F.3d 413 (4th Cir. 2014). *Chapman v. Oakland Living Ctr., Inc.*, 48 F.4th 222 (4th Cir. 2022). That said, a plaintiff must display that the employer had a high degree of control over the third party to establish employer liability. *See Menaker v. Hofstra Univ.*, 935 F.3d 20, 42 (2d Cir. 2019).

anonymous emails that were sent to Dr. Bility, these events did not explicitly relate to his race. The alleged events are as follows:

(1) In 2019, Dr. Burke met with Dr. Bility and discouraged him from presenting his research findings at a conference.

(2) In 2021, Dr. Burke published an article that plagiarized Dr. Bility's research discussed in the 2019 meeting.

(3) In the fall of 2020, Dr. Bility's office was vandalized multiple times and his nametag was thrown across the floor.

(4) In fall of 2021, an unknown individual tampered with the ceiling in Dr. Bility's office.

(5) In fall of 2020, during a Zoom town hall meeting, students orally harassed Dr. Bility.

(6) In December 2020, an unnamed "powerful individual" at the University stopped the transfer of Dr. Bility's lab to the Hillman Cancer Center.

(7) In August 2021, Dean Lichtveld directed Dr. Bility to remove a footnote acknowledgment to an NIH funded grant from his research article.

(8) In early 2021, Dean Lichtveld "commented that she was informed" that Dr. Bility did not have approval to use fetal tissues from ABR.

Dr. Bility claims that every one of these events occurred because of his race. However, he fails to sufficiently plead facts that each of these individual events were connected to his race. Instead, Dr. Bility uses conclusory statements to support his claims that each event was motivated by his race. For example, regarding the events related to his research, Dr. Bility alleges that "similarly situated non-Black Scientists engaging in groundbreaking research at Defendant Pitt Health Sciences are not treated in a similar manner." (ECF No. 9, at ¶39). As to his acquisition of fetal tissue, Dr. Bility alleged that "defendant Pitt did not block, or target similarly positioned non-

Black faculty at Defendant Pitt who perform research involving fetal tissues." *Id.* ¶51. Conclusory statements such as these are not specific enough to make it plausible that these alleged actions were because of his race. As such, Dr. Bility's hostile work environment claim against the University fails.

As Mr. Bility did not plead sufficient facts to show that respondeat superior liability existed concerning his Hostile Work Environment claim, the University's Motion to Dismiss will be granted. As the Court cannot say that amendment would be inequitable or futile, Dr. Bility will be granted leave to amend regarding his Count I, Hostile Work Environment claim.

### B.  Count II - Title VII Retaliation Claim

Dr. Bility brings a Title VII Retaliation claim against the University. The University argues that Mr. Bility fails to state a claim for retaliation against the University because Mr. Bility failed to establish a plausible causal connection between a protected activity and an adverse employment action. (ECF No. 22, at 14). Dr. Bility argues that the University retaliated against him on various occasions. Dr. Bility alleges that the University retaliated against him by (1) appointing Dr. Jessica Burke, Dr. Donald Burke's daughter, as interim chair of Dr. Bility's department to "intimidate Dr. Bility" in April 2021 (ECF No 9, at ¶ 49); (2) by "blocking" Dr. Bility from mentoring a group of high school students in April 2022 (*Id.* ¶ 50); (3) by restricting Dr. Bility from obtaining fetal tissues from ABR (*Id.* ¶ 51); and (4) by stalling Dr. Bility's tenure review, "insisting that Dr. [Jessica] Burke serve as author of the chair's letter of recommendation" for tenure, and the eventual denial of Dr. Bility's tenure. (*Id.* ¶ 50). Dr. Bility avers that all these actions were because he complained about race discrimination against Dr. Donald Burke and Dr. Lichtveld. *Id.*

Title VII prohibits discrimination against any individual "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also prohibits an employer from discriminating against an employee who has opposed an employer's discriminatory conduct or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" related to the employer's discriminatory conduct. 42 U.S.C. § 2000e-3(a). To establish a prima facie retaliation claim, a plaintiff must show that (1) they engaged in conduct protected by Title VII; (2) their employer took an adverse employment action against them; and (3) a causal link existed between their protected conduct and the employer's adverse action. *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016).

As to the second element of a retaliation claim under Title VII, a plaintiff must establish that a "reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). As to the third element, if there is a causal connection between the protected conduct and the adverse action, the "the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred." *Mercer v. SEPTA*, 608 Fed. Appx. 60, 65 (3d Cir. 2015) (quoting *Krouse v. Am. Sterlilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997)). As such, an "adverse action must occur within days, not months, of the protected activity." *Id.*

The Court will address each of the alleged retaliatory events in turn. First, the appointment of Dr. Jessica Burke as interim chair of Dr. Bility's department. As for this alleged action, Dr. Bility fails to plead sufficient factual allegations to raise a plausible inference that Dr. Jessica Burke's appointment adversely affected him in a material way. Dr. Bility alleges that the

11

University appointed Dr. Jessica Burke to the position to "intimidate" him because of his complaints against her father. (ECF No. 9, at ¶ 49). Intimidation in this context is not enough to be considered a materially adverse action.

Further, Dr. Bility does not sufficiently plead that there is a causal connection between his racial discrimination complaints and the appointment of Dr. Jessica Burke. Dr. Jessica Burke was appointed to the position in April 2021. (*Id.* ¶ 49). Dr. Bility complained about racial discrimination by Dr. Donald Burke on December 19, 2021 (*Id.* ¶ 26), and by Dr. Lichtveld on September 13, 2021. (*Id.* ¶ 40). These complaints were made *after* Dr. Jessica Burke was appointed as interim chair of Dr. Bility's department. The only other complaint about racial discrimination by Dr. Bility was made on February 15, 2019, through a confidential email to Dr. Nobel Maseru, the Associate Dean of Diversity in the School of Public Health. (*Id.* ¶ 24). This email was sent more than two years before the appointment of Dr. Jessica Burke and is thus not sufficient to infer a causal relationship.

Second, the Court will address Dr. Bility's averment that Dean Lichtveld "blocked" him from mentoring, supervising research, and giving a presentation to local high school students. Dr. Bility alleges that Dr. Lichtveld retaliated against him between April 22 and 26, 2022, after he was asked to serve as a mentor to high school students. (*Id.* ¶50). Dr. Bility pleads that Dr. Lichtveld took on the mentoring position herself "once she became aware of Dr. Bility's participation." (*Id.*). Dr. Bility further avers that Dr. Lichtveld blocked Dr. Bility from giving a presentation about cancer to high school students. (*Id.*) Accepting these events as true, neither of them rises to the level of what would be a considered a sufficient materially adverse action because they do not materially alter his working conditions. Additionally, these actions occurred nearly one and a half years after Dr. Bility made his racial discrimination claims against Drs.

Donald Burke and Lichtveld. As such, there is also not an adequate causal connection between these acts and the complaints made.

Third, Dr. Bility avers that Dr. Lichtveld blocked him from obtaining fetal tissue from ABR. (*Id.* ¶51). Dr. Bility alleges that he met with Dr. Lichtveld in "early 2021" where she informed him that he did not have the proper approvals to receive fetal tissue from ABR. (*Id.* ¶ 42). On October 21, 2021, he was informed through email by Dr. Bill Yates, the Vice Chancellor of Research Protections, that he would not be receiving his fetal tissue samples. (*Id.* ¶ 51) In email communications between Dr. Yates and Dr. Lichtveld, Dr. Lichteveld thanked Dr. Yates. (*Id.*). Dr. Bility alleges that this expression of gratitude infers that Dr. Lichtveld was the reason that Dr. Bility did not receive the fetal tissues. (*Id.*). Dr. Bility further alleges that this "blocking" was because of his race since no other non-Black faculty were treated similarly. (*Id.*)

As for this occurrence, Dr. Bility fails to plead an adverse employment action. Dr. Bility avers that he could not obtain fetal tissue from a specific supplier, not that he was restricted from obtaining any fetal tissue. This is not a materially adverse action. And the conclusory statements made by Dr. Bility connecting the action to his race cannot by itself create a plausible inference that the action was made because of his race. Additionally, Dr. Lichtveld first informed Dr. Bility that he lacked the proper approvals to obtain the fetal tissues in "early 2021," long before Dr. Bility made his first formal complaint for race discrimination on September 13, 2021. Moreover, this is even further in time away from his confidential complaint to Dr. Nobel Maseru in 2019. As such, there is no causal connection between the formal complaint and the alleged blocking of obtaining fetal tissue from ABR.

Fourth, the denial of tenure to Dr. Bility by the University. Dr. Bility alleges that the University did not adhere to their own policies in deciding his tenure. Dr. Bility further claims

13

that "similarly positioned non-Black faculty at Pitt are not treated in a similar manner." (*Id.* ¶52).

This conclusory statement is not enough to suggest that there is a causal relationship between his

formal complaints about racial discrimination and the denial of his tenure. The substantial

passage of time between his formal discrimination complaints and the tenure decisions does not

support or even suggest that any causal connection existed between the alleged protected activity

and the tenure decision. Dr. Bility asserts that he made his first formal discrimination complaint

against Dr. Lichtveld on September 13, 2021, and his second against Dr. Burke on December 19,

2021. (*Id.* ¶¶ 26, 40). That said, the University did not consider Dr. Bility for tenure until April

2022, and they did not make their final decision until June 2023. These actions are too far

removed from Dr. Bility's complaints regarding race discrimination.

As Dr. Bility does not plead sufficient facts to establish his Retaliation claim, the

University's Motion to Dismiss will be granted. As the Court cannot say that amendment would

be inequitable or futile, Mr. Bility will be granted leave to amend regarding his Count II,

Retaliation claim.

### C.  Count III – 42 U.S.C. § 1983 Equal Protection Clause Claim

Dr. Bility brings Equal Protection Clause claims against Dr. Donald Burke and Dr.

Maureen Lichtveld for racial discrimination. The Equal Protection Clause of the Fourteenth

Amendment provides that "[n]o State shall make or enforce any law which shall. . . deny to any

person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, §1. To

bring an equal protection claim for race discrimination against an individual, a plaintiff must

prove that the individual intentionally discriminated against the plaintiff. *Kimber-Anderson v.*

*City of Newark*, 502 Fed. Appx. 210, 214 (3d Cir. 2012). Equal protection claims regarding

employment brought under Section 1983, like Title VII claims, require an adverse employment

action. *Ford v. Cty. of Hudson*, 729 Fed. Appx. 188, 194-95 (3d Cir. 2018). An adverse employment action is a "significant change in employment status, such as hiring firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 195.

**Dr. Donald Burke**

Dr. Donald Burke argues that Dr. Bility alleges only two recognizable bases for this claim against him: that Dr. Donald Burke (1) pressured Dr. Bility to not present his research at a conference in 2019; and (2) plagiarized Dr. Bility's ideas by publishing an article in November 2021. (ECF No. 22, at 6). Dr. Donald Burke argues that this claim against him fails because the Amended Complaint does not allege an adverse employment action or intentional discrimination by Dr. Burke. (ECF No. 22, at 6-9).  Dr. Donald Burke further argues that he was not acting under the color of state law regarding the alleged plagiarism and that one of the alleged actions, that he pressured Dr. Bility not to present his research, is time-barred. (*Id.*) Dr. Bility responds and argues that Dr. Donald Burke initiated, and perpetuated widespread disparate treatment based on race including, failing to investigate the anonymous racially charged emails directed at Dr. Bility, attempting to pressure Dr. Bility into not presenting his research, plagiarizing Dr. Bility's ideas, and sabotaging Dr. Bility's tenure assessment. (ECF No. 9, at ¶¶ 11-33).

The Court agrees with Dr. Donald Burke. The only alleged actions that can be attributed to him are the meeting where he allegedly pressured Dr. Bility to not present his research, and the alleged plagiarism. The other actions attributed by Dr. Bility to Dr. Donald Burke are related to other Defendants or are too attenuated to be attributed to Dr. Donald Burke. Bare conclusory statements that claim Dr. Donald Burke "unofficially runs the School of Public Health" after his retirement are not enough to connect all the alleged wrongs experienced by Dr. Bility to Dr.

15

Donald Burke. (*Id.* ¶ 36). As such, the Court will address the two recognizable claims against Dr. Donald Burke.

Turning to the first allegation, that Dr. Donald Burke discriminated against Dr. Bility by pressuring him not to present his research. Dr. Donald Burke argues that this allegation is outside the statute of limitations for claims being brought under §1983. The Court agrees that this allegation is outside the statute of limitations and thus time-barred. "[T]he statute of limitations applicable to a §1983 claim is dictated by the personal-injury tort law of the state in which the cause of action arose. Pursuant to Pennsylvania law, the applicable statute of limitations is two years." *Bytner v. Allegheny County Jail*, 2018 WL 4407837, *4 (W.D. Pa. Sept. 17, 2018) (citing *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009). Here, Dr. Bility pleads that the meeting in which Dr. Donald Burke discouraged him from presenting his research occurred in February 2019, and he subsequently presented the research in April 2019. (ECF No. 9, at ¶¶ 14-15, 17). Dr. Bility filed his claims against Dr. Donald Burke on May 10, 2023, more than four years after the alleged meeting. (ECF No. 9, at 1). This is well past the two-year statute of limitations for §1983 claims.

Dr. Bility argues that the continuing violation doctrine applies here and therefore tolls the statute of limitations for this allegation. Under the continuing violation doctrine, "when the defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period." *Brenner v. Loc. 514, United Bhd. Of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1295 (3d Cir. 1991). The Court has already established the only two occurrences that can be attributed to Dr. Donald Burke are the meeting in 2019, and the alleged plagiarism in 2021. These two events happened too far apart from one another for the actions to be considered a part of a continuing practice. *See Coombs v.*

*Target Corp.*, 2013 WL 664186, *4 (E.D. Pa. Feb. 25, 2013) (finding that a two-year "break in time destroys the pattern of harassment and does not establish a continuing violation.). Thus, Dr. Bility's claim against Dr. Donald Burke was not tolled by the continued violation doctrine, and such claim is time-barred.

Even if this allegation were not time-barred, pressuring Dr. Bility to not present his research is not an adverse employment action. Dr. Bility does not sufficiently allege that he suffered any consequences from the meeting with Dr. Donald Burke nor that the consequences resulted in a significant change in his employment status. In fact, he pleads that he gave the research presentation and subsequently published his work for a brief amount of time. Therefore, this alleged action does not constitute an adverse employment action.

Further, the allegations Dr. Bility made to connect these events to race discrimination are too conclusory. Dr. Bility must show that he was intentionally discriminated against by Dr. Donald Burke because of his race. In support of this allegation, Dr. Bility uses conclusory statements, alleging that the actions taken by Dr. Donald Burke were because of Dr. Bility's race. But Dr. Bility does not plead any specific facts to support these allegations. Dr. Bility alleges that Dr. Donald Burke is generally biased against Black people because Dr. Burke had a bust of former United States Surgeon General, Dr. Thomas Parran, who oversaw the Tuskegee syphilis studies, in his office. (ECF No. 9, at ¶ 33). This general and conclusory allegation of racial bias is not enough to create any reasonable inference that Dr. Donald Burke intentionally discriminated against Dr. Bility. *See Elmore v. Clarion Univ.*, 933 F. Supp. 1237, 1244 (M.D. Pa. 1996) ("Conclusory allegations of generalized bias do not establish discriminatory intent"). Thus, Dr. Bility's claim would also fail for this reason.

17

Turning to the second allegation, that Dr. Donald Burke discriminated against Dr. Bility by plagiarizing his ideas in another research article. Dr. Donald Burke argues that Dr. Bility fails to properly plead that Dr. Donald Burke was acting under the color of state law when he allegedly plagiarized the article. (ECF No. 22, at 8). Dr. Bility argues that he properly alleged that Dr. Donald Burke was acting under the color of state law, because the alleged plagiarism occurred while Defendant Burke was employed at Pitt. (ECF No. 24, at 5; ECF No. 9, at ¶¶ 63, 11-33).

The Third Circuit has held, "[i]t is well settled that an otherwise private tort is not committed under the color of state law simply because the tortfeasor is an employee of the state." *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1150 (3d Cir. 1995). The alleged "act must entail misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* (internal quotation marks omitted). The alleged plagiarism by Dr. Donald Burke of Dr. Bility's ideas did not depend on his position as Dean, nor did Dr. Bility sufficiently plead facts to support that the plagiarism was made possible due to his position as Dean. Moreover, when the article was published, Dr. Donald Burke was no longer Dean, as he had retired a year earlier. (ECF No. 9, at ¶ 35). As such, Dr. Bility fails to sufficiently allege that Dr. Donald Burke was acting under the color of state law in plagiarizing and publishing as alleged.

Further, like with the first allegation in his claim against Dr. Donald Burke, Dr. Bility fails to properly allege that the plagiarism constitutes an adverse employment action, and that Dr. Donald Burke did so because of Dr. Bility's race. Dr. Bility does not allege that he suffered any direct consequences as a result of the alleged plagiarism that resulted in any significant change in his employment status. Additionally, Dr. Bility relies on conclusory statements and does not

18

allege specific instances or facts that would permit any inference that Dr. Donald Burke's alleged plagiarism was motivated by race. As such, Dr. Bility fails to sufficiently allege that Dr. Donald Burke plagiarized Dr. Bility's ideas because of his race.

## Dr. Maureen Lichtveld

Dr. Lichtveld argues that this claim fails against her because the Amended Complaint does not sufficiently allege an adverse employment action or intentional discrimination by Dr. Lichtveld as to any of the alleged claims against her. Dr. Bility argues that Dr. Lichtveld made adverse employment actions against him, that they were intentional, and that they were because of his race. Dr. Bility claims that Dr. Lichtveld discriminated against him by (1) prohibiting him from obtaining fetal tissues from ABR (*Id.* ¶¶ 42; 51); (2) requesting that Dr. Bility remove a footnote referencing grants from the NIH in his research article (*Id.* ¶ 36); and (3) "blocking" Dr. Bility from mentoring and giving a lecture to high school students in a summer program. (*Id.* ¶ 36).

None of the three assertions against Dr. Lichtveld, as pleaded, rise to the level of an adverse employment action. Turning to the first assertion, Dr. Bility does not allege that Dean Lichtveld prohibited him from using fetal tissue in his research, only that he was prohibited from obtaining fetal tissue from ABR. Further, Dr. Bility does not sufficiently allege that the ABR source restriction affected Dr. Bility's employment status at the University. As for the second assertion, Dr. Bility also fails to allege facts to support that Dr. Litchveld's request for removal of the grant acknowledgments had any effect on Dr. Bility's employment at the University. Further, Dr. Lichtveld apologized for her mistake and miscommunication in asking for the removal of the acknowledgment. (ECF No. 9, at ¶ 46). Thus, Dr. Bility did not have to make any changes to the article, and he suffered no adverse employment consequences. For the third

assertion, Dr. Bility fails to allege that Dr. Lichtveld's decision to block him from mentoring and lecturing high school students changed or affected his employment status with the University. As such, Dr. Bility fails to sufficiently plead that any of these alleged actions by Dr. Lichtveld rise to the level of adverse employment actions.

Moreover, Dr. Bility fails to sufficiently allege facts to support that Dr. Lichtveld intentionally discriminated against him based upon his race. As support for all these allegations against Dean Lichtveld, Dr. Bility pleads conclusory statements that Dr. Lichtveld targeted or harassed him because of his race, or that she did not target similarly situated non-Black individuals. Dr. Bility fails to provide specific examples or proper comparator evidence to support his assertions of intentional discrimination by Dr. Lichtveld. Conclusory statements alleging discrimination are not sufficient. *See Fisher v. Cath. Soc. Servs.*, 2019 WL 3731688, *5 (E.D. Pa. Aug. 8, 2019) (broad statements related to discrimination "without identifying any comparators or how they were similarly situated is exactly a threadbare recital[] of the elements of a cause of action that *Iqbal* repudiates.) (internal quotations omitted).

As for the allegation that Dr. Lichtveld discriminated against Dr. Bility by allegedly prohibiting his use of fetal tissues, Dr. Bility alleges that "Dr. Ayyavoo, an Asian American in the same department as Dr. Bility and in a similar position regarding the use of fetal tissues in NIH funded research", was not "targeted" or "tricked" regarding the use of fetal tissues. (ECF No. 9, at ¶ 38). However, said bare conclusory pleading is not sufficient to satisfy the pleading requirement for a comparator to support his claim. As a result, this example does not serve as proper comparator evidence to show intentional racial discrimination, and said claim fails.

As Mr. Bility did not plead sufficient facts concerning his Equal Protection Claim against Drs. Donald Burke and Lichtveld, the Motion to Dismiss will be granted as to this claim. As the

Court cannot say that amendment would be inequitable or futile, Mr. Bility will be granted leave to amend regarding his Count III, Equal Protection claim.

### D.  Count IV – 42 U.S.C. § 1981 through 42 U.S.C. § 1983 Equal Protection Clause Claim

Drs. Donald Burke and Lichtveld argue that Dr. Bility fails to sufficiently plead facts that allege an adverse employment action or intentional discrimination, or that race discrimination was the but-for cause of any lost enumerated right under § 1981. (ECF. No. 21, at 2). The University argues that Dr. Bility fails to allege intentional discrimination or adverse employment action by the University. (*Id.*). Dr. Bility argues that all Defendants intentionally discriminated against him, and that race was the but-for cause of the loss of his 14th Amendment rights under §1981. (ECF No. 9, at ¶ 69-71).

Title 42 U.S.C. §1981 provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." Like the Equal Protection Clause, this statute "can only be violated by purposeful discrimination." *Gen. Bldg. Contractors Ass'n v. Pa.*, 458 U.S. 375, 389 (1982); *See also Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 14 S.Ct. 1009, 1019 (2020) (holding that §1981 claims require a plaintiff to plead "but for race, [he] would not have suffered the loss of a legally protected right."). 42 U.S.C. § 1981 has a four-year statute of limitations. *McGovern v. City of Philadelphia*, 554 F.3d 114 (3d. Cir. 2009).

For the same reasons discussed above, this claim against Drs. Donald Burke and Dr. Lichtveld fail. Dr. Bility does not sufficiently plead that Dr. Donald Burke or Dr. Lichtveld intentionally discriminated against him in any way that affected any legally protected right. Further, the allegation that Dr. Donald Burke discriminated against Dr. Bility by pressuring him at the 2019 meeting is time-barred under §1981. The meeting took place on February 13, 2019, and these claims were filed on May 10, 2023, more than four years later.

As regards this claim against the University, Dr. Bility seems to attribute the actions of Dr. Donald Burke and Dr. Lichtveld to support his claims that the University violated § 1981. For the same reasons that Dr. Bility failed to sufficiently plead this claim against the individual Defendants, the claims pleaded against the University also fail.

As Mr. Bility did not plead sufficient facts concerning his § 1981 claim, the Motion to Dismiss will be granted. As the Court cannot say that amendment would be inequitable or futile, Mr. Bility will be granted leave to amend regarding Count IV, 42 U.S.C. § 1981 through 42 U.S.C. § 1983 Equal Protection Clause claim.

## IV.    Conclusion

For the reasons stated above, Defendants' Motion to Dismiss will be granted in full. Dr. Bility will be granted leave to amend as to all counts.

Dr. Bility may file a Second Amended Complaint with regard to all Counts by November 8, 2023. If Mr. Bility files a Second Amended Complaint, Defendants shall file their responsive pleadings within 14 days of Mr. Bility's filing of a Second Amended Complaint. If no Second Amended Complaint is filed by November 8, 2023, then the case will be dismissed with prejudice and the clerk will mark the case as closed. An appropriate Order will follow.

DATE: 10/25/2023

Marilyn J. Horan
United States District Judge