IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PITTSBURGH

| | | |
|---|---|---|
| MOSES T. BILITY, PHD; | ) | |
| | ) | |
| | ) | **2:23-CV-00770-MJH** |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| UNIVERSITY OF PITTSBURGH, DEAN DONALD BURKE, DEAN MAUREEN LICHTVELD, | ) ) ) | |

Defendants.

## **MEMORANDUM OPINION**

Plaintiff, Moses T. Bility, filed the present lawsuit against Defendants, University of Pittsburgh, Dean Donald Burke, and Dean Maureen Lichtveld on May 10, 2023. (ECF No. 1). Dr. Bility filed an Amended Complaint on July 3, 2023. (ECF No. 9). The Amended Complaint alleged claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1983 ("§1983"), and 42 U.S.C. §1981 ("§1981"). (ECF No. 9). On October 25, 2023, the Court granted Defendants' Motion to Dismiss in full. (ECF No. 27). Dr. Bility was granted leave to amend all of his claims. On November 8, 2023, Dr. Bility filed a Second Amended Complaint, again alleging claims under Title VII, § 1983, and § 1981. (ECF No. 28). Presently, before the Court, is Defendants' second Motion to Dismiss for Failure to State a Claim. (ECF No. 29). Defendants' Second Motion to Dismiss has been fully briefed and is ripe for decision.

For the reasons stated below, Defendants' Motion to Dismiss will be granted in part and denied in part.

1

I.     **Statement of Facts**

In 2015, Dr. Bility began working at the University of Pittsburgh ("the University") as an Assistant Professor at the School of Public Health in the Department of Infectious Diseases and Microbiology. (ECF No. 28, at ¶ 9). In January 2019, he was invited to make a presentation at the Global Health and Inequities and Infectious Disease Workshop regarding his research on geomagnetic fields. (*Id.* ¶ 17). In 2019, before Dr. Bility presented his research, Dr. Burke, then the Dean of the School of Public Health, asked to meet with Dr. Bility to discuss his research. (*Id.* ¶ 18). This meeting occurred on February 13, 2019. (*Id.* ¶ 19). Dr. Bility alleges that at the meeting, Dr. Donald Burke "told [him] several times that he had nothing to contribute and tried to persuade him not to present his groundbreaking research and give up pursuing the research." (*Id.*). On February 15, 2019, after the meeting, Dr. Bility sent a confidential email to Dr. Nobel Maseru, the Associate Dean of Diversity in the School of Public Health, detailing the meeting and alleging that Dr. Donald Burke thought he could bully Dr. Bility into not giving his presentation, because Dr. Bility is Black. (*Id.* ¶ 29). To support his averment that Dr. Burke was racially biased, Dr. Bility alleges that Dr. Burke kept a bust of Dr. Thomas Parran, the doctor who led the Tuskegee syphilis studies, in his office. (*Id.* ¶ 39). Dr. Burke allegedly only took the bust down after students protested that it was in his office. Dr. Bility presented his research on April 12, 2019. (*Id.* ¶ 22).

Dr. Bility alleges that the University "exhibits a profound racial disparity within its tenured faculty composition demonstrating a systemic bias against Black professors." (*Id.* at ¶ 11). In support of this allegation, Dr. Bility cites a report by PublicSource, published in August 2021. The report stated, "that out of 1,163 tenured faculty members at the University's main campus,

2

only 27 were Black, constituting roughly 2% of the tenured faculty. This percentage is significantly lower than the Black population of Pittsburgh, which stands at 22%" (*Id.*). Dr. Bility further alleges that he is the only Black professor within the Department of Infectious Diseases and Microbiology at the University. (*Id.* ¶ 12).

In October 2020, Dr. Bility published an article, that discussed his research and its relation to COVID-19, in a peer reviewed journal titled *Science of the Total Environment*. (*Id.* ¶ 25). Dr. Bility removed his COVID-19 article from publication on November 2, 2020. (*Id.*). As a result of the publication, Dr. Bility alleges that a series of events took place: someone vandalized his office by throwing his name tag and tampering with his ceiling (*Id.* ¶ 25(a)), a professor from John Hopkins University allegedly instructed the University to remove Dr. Bility's article from publication (*Id.* ¶ 25(b)), and "unnamed senior officials" expressed displeasure about the article. (*Id.* ¶ 25(e)). Dr. Bility alleges that, on November 12, 2020, students called him derogatory names at a public forum, conducted via Zoom, that was held to discuss Dr. Bility's academic integrity as well as his research article. (*Id.* ¶ 25(f)). Dr. Bility alleges that two anonymous racially derogatory emails were sent to him before and after the public forum. (*Id.* ¶ 25(g)). The first email was dated November 7, 2020, it referenced "Exam grade," and stated, "Dear Mr. Bility, I'd like to inquire about your n[][][][]r science from Chinese voodoo. I've got a master boner that I can't get rid of. If I pray to LeBrown James Junior with some magic crystals surrounding me will it go away? I'll thank from the bottom of my heart if you can answer to the best of your a(bility)s." (*Id.* ¶ 25(g)(i)). The second email was dated November 14, 2020, the subject line read, "DAMN N[][][]A U STUPID," and stated, "FUCK YOU AND YOUR BAD STUDIES. Except of course this was a post-ironic article, if that was so-respect!" (*Id.* ¶ 25(g)(ii)).

Dr. Bility alleges that these emails were sent to his university email account, that he uses "almost entirely" for communication with the University of Pittsburgh Community. (*Id.* ¶ 25(h)). Dr. Bility further alleges that the first email was sent just before the investigative proceedings regarding his research, suggesting that the sender had prior knowledge of the November 12, 2020 Zoom forum. (*Id.*). Dr. Bility alleges that the second email was sent an hour after the Zoom public forum was held. (*Id.*). Dr. Bility alleges that the contents of the emails imply that they could only have come from within the University community, because they contained knowledge of Dr. Bility's work that he only shared internally. (*Id.*) Dr. Bility avers that there was no investigation or resolution about the emails conducted by the University. (*Id.*).

Dr. Bility pleads that he filed a complaint with the University of Pittsburgh Police ("Pitt Police") on November 7, 2020, after he received the first email, and requested that the University find out who sent the email by pinpointing their IP address. (*Id.* ¶ 25(i)). After Dr. Bility received the second email, he forwarded it to Pitt Police. (*Id.* ¶ 25(l)). Pitt Police informed Dr. Bility that the incident was being investigated and that he must remain patient while they conducted their investigation. (*Id.* ¶ 25(k)). Dr. Bility alleges that he also forwarded the emails to Eleanor Feingold, Executive Associate Dean of the School of Public Health. (*Id.* ¶ 25(j)). Dr. Bility avers that the University did not assist in Pitt Police's investigation or conduct their own investigation, even though they had "exclusive access and control" of the email servers that store the IP addresses of emails that come into Dr. Bility's university email inbox. (*Id.* ¶ 25(m)).

In the fall of 2020, Dr. Bility was transferring his research lab to the Hillman Cancer Center when the director of the research center informed him that "an unnamed powerful individual in the Defendant Pitt Health Sciences did not allow Dr. Bility to move to the center." (*Id.* ¶ 25(n)).

4

On January 1, 2021, Dr. Maureen Lichtveld ("Dr. Lichtveld") became the Dean of the School of Public Health after Dr. Donald Burke retired. (*Id.* ¶ 41). Early in 2021, in a meeting called by Dr. Lichtveld, she informed Dr. Bility that he did not have the proper approvals to receive fetal tissues for his research from Advanced Bioscience Resources ("ABR"). (*Id.* ¶ 48). Dr. Bility claims that he subsequently provided the required approvals to Dr. Lichtveld, but she did not respond. (*Id.*) Dr. Bility alleges that Dr. Lichtveld later prohibited him from receiving fetal tissues from ABR. (*Id.* ¶ 57).

In April 2021, the University appointed Dr. Jessica Burke, daughter of Dr. Donald Burke, and Vice Dean of the Pitt School of Public Health, as the interim chair of Dr. Bility's department at the school. (*Id.* ¶ 55).

On August 27, 2021, Dean Lichtveld emailed Dr. Bility, informing him that the National Institute of Health ("NIH") wanted him to remove acknowledgments to two grants from the COVID-19 article. (*Id.* ¶ 42). Concerned about the repercussions of removing the acknowledgments, and the possibility that their absence from the article would violate the law, Dr. Bility requested confirmation that the NIH reached out to Dr. Lichtveld and directed her to get Dr. Bility to remove the acknowledgments. (*Id.* ¶ 45). After requesting this confirmation, on September 13, 2021, Dr. Bility filed a formal complaint with the University against Dr. Lichtveld for race discrimination. (*Id.* ¶ 46). As a result of this complaint, the University conducted an eight-month "inquiry," after which, they concluded that Dr. Bility's complaint "had no merit, and a full investigation was unwarranted." (*Id.* ¶ 53). On April 7, 2022, Dr. Lichtveld emailed Dr. Bility and informed him that her original request to remove the acknowledgment was a mistake and that the entire situation was a misunderstanding. (*Id.* ¶ 52).

Dr. Bility alleges that on November 28, 2021, a colleague informed him that Dr. Donald Burke plagiarized his work. (*Id.* ¶ 30). In response, Dr. Bility brought a formal complaint in a letter to Vice Provost Lu-in Wang, who forwarded the complaint to Dr. Wilcox, a University Research Integrity Officer. (*Id.* ¶ 31). A three-person University inquiry panel was created to investigate the alleged plagiarism. (*Id.* ¶ 34). Dr. Jane Cauley, Dr. Doug Reed, and Dr. Julie Fiez were selected to serve on the panel. (*Id.*). The panel unanimously found that the plagiarism allegations lacked sufficient substance to warrant a formal investigation. (*Id*). In his Second Amended Complaint, Dr. Bility alleges that two of the panel members, Drs. Cauley and Reed, have a close friendship with Dr. Donald Burke so their selection violated University policy. (*Id.* ¶ 37). Dr. Bility avers that the University chose the panel members because Dr. Donald Burke is White, and Dr. Bility is Black. (*Id.*).

Dr. Bility alleges that in April 2022, Dr. Lichtveld "blocked" him from mentoring and giving a research presentation to a group of high school students during a summer program. (*Id.* ¶ 56). Dr. Bility claims that he accepted the invitation to serve as a mentor to the students, but Dr. Lichtveld insisted that she would mentor the students instead. (*Id.*).

Dr. Bility also alleges that in April 2022, the University mishandled his tenure application process by slowing up the process, not adhering to established policy, and insisting that Dr. Jessica Burke author his letter of recommendation for tenure. (*Id.* ¶ 58). The University denied Dr. Bility's application for tenure on June 28, 2023. (*Id.*). Dr. Bility avers that the tenure denial was retaliation for his race discrimination claims, the complaint he filed against the University, Dr. Burke, and Dr. Lichtveld, and because he challenged the "racial hierarchal system" at the University. (*Id.*).

Dr. Bility alleges that he has suffered embarrassment, substantial mental anguish, emotional distress, and loss of wages and potential earnings. (*Id.* ¶ 59). Dr. Bility further alleges that the discrimination has affected his family who have been deprived of receiving his care and attention because he has been coping with the discrimination by the Defendants. (*Id.*).

## II.     Relevant Legal Standards

When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Eid v. Thompson*, 740 F.3d 118, 122 (3d Cir. 2014) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The Supreme Court clarified that this plausibility standard should not be conflated with a higher probability standard. *Iqbal*, 556 U.S. at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556); *see also Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 147 (3d Cir. 2014). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "Factual allegations of a complaint must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. A pleading party need not establish the elements of a *prima facie* case at this stage; the party must only "put forth allegations that 'raise a reasonable expectation that discovery will reveal

evidence of the necessary element[s].'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009) (quoting *Graff v. Subbiah Cardiology Assocs., Ltd.*, 2008 WL 2312671 (W.D. Pa. June 4, 2008)); *see also Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016).

Nonetheless, a court need not credit bald assertions, unwarranted inferences, or legal conclusions cast in the form of factual averments. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 n.8 (3d Cir. 1997). The primary question in deciding a motion to dismiss is not whether the plaintiff will ultimately prevail, but rather whether he or she is entitled to offer evidence to establish the facts alleged in the complaint. *Maio v. Aetna*, 221 F.3d 472, 482 (3d Cir. 2000). The purpose of a motion to dismiss is to "streamline[] litigation by dispensing with needless discovery and factfinding." *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989).

Furthermore, "in evaluating a motion to dismiss, courts are not limited to the complaint, but may also consider evidence integral to or explicitly relied upon therein." *Tanksley v. Daniels*, 902 F.3d 165, 172 (3d Cir. 2018) (internal quotations omitted). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (citation omitted).

In a civil rights case, when the court grants a motion to dismiss for a failure to state a claim, the court must offer the plaintiff leave to amend, even if it was not requested by the plaintiff, "unless doing so would be inequitable or futile." *Phillips*, 515 F.3d at 246; *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251 (3d Cir. 2007).

**III. Discussion**

**A. Count I – Title VII Hostile Work Environment, Discrimination, and Disparate Treatment Claims**

Dr. Bility brings Title VII claims against the University for allegedly subjecting him to a hostile work environment, discrimination, and disparate treatment based upon his race. (ECF No. 28, at 30).

i.  *Hostile Work Environment*

Dr. Bility brings a Title VII hostile work environment claim against the University. (*Id.*). The University argues that Dr. Bility fails to allege intentional discrimination as well as pervasive or severe discrimination in the Second Amended Complaint. (ECF No. 30, at 11). Dr. Bility argues that the University intentionally subjected him to a pervasive and constant hostile work environment based upon his race. (ECF No. 28, at ¶ 62).

To establish a prima facie case of hostile work environment, a plaintiff must show: "(1) that he suffered intentional discrimination because of his race or national origin; (2) that the discrimination was severe and pervasive; (3) that the discrimination detrimentally affected him; (4) that the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability." *Sanchez v. SunGard Availability Servs. LP*, 362 F. App'x 283, 286 (3d Cir. 2010). In conducting this analysis, courts must evaluate all the circumstances, including, "the frequency of the conduct, the severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance." *Id.* at 287 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23). Further, Title VII "protects a plaintiff only as to harassment based on discrimination against a protected class." *Ullrich v. United States Secy. Of Veterans Affairs*, 457 Fed. Appx. 132, 140 (3d. Cir. 2012). "Many may suffer severe or pervasive harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief." *Id.* (internal quotation marks and citations omitted). Title VII is not a "general civility code" and

9

"forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment." *Onacle v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998).

In Dr. Bility's Second Amended Complaint, he relies on the same allegations made in his First Amended Complaint, but he adds additional context to the anonymous derogatory emails that he received. Dr. Bility alleges that he received the first email just before the Zoom town hall, and that its content displayed a knowledge of the investigation of his academic integrity and the public event. Dr. Bility also argues that the mention of "exam grade" implies that the email came from a member of the University community. As to the second email, Dr. Bility also alleges that his receipt of said email an hour after the Zoom town hall ended supports his assumption that it came from a member of the University community. Dr. Bility further argues that he only distributed his university email to members of the University community.

To attribute liability for a hostile work environment to a defendant under Title VII, Dr. Bility must prove the existence of respondeat superior liability to the employer.[1] The additional context that Dr. Bility provides in his Second Amended Complaint, relates to the anonymous emails, does not sufficiently establish respondeat superior liability for the University. Dr. Bility claims he received the first email on November 7, 2020, which was five days before the November 12, 2020 Zoom town hall. The content of the first email does not display any intimate knowledge of Dr. Bility's work that could not have been ascertained from his October 2020 publication of his article in *Science of the Total Environment*. Additionally, the reference to "Exam grade" in the

---

[1] Employer liability is typically reserved to instances in which a supervisor or co-worker are the perpetrators of discriminatory actions. *See Huston v. P&G Paper Prods. Corp.*, 568 F.3d 100, 104-05 (3d Cir. 2009). If a hostile work environment is created by a supervisor, the employer is subject to vicarious liability. *Id.* If the discrimination is by a co-worker, the employer could be found liable for negligently failing to discover the discrimination or failing to respond to the harassment. *Id.* Courts have applied this co-worker negligence theory to discrimination by third parties. *See Freeman v. Dal-Tile Corp.*, 750 F.3d 413 (4th Cir. 2014). *Chapman v. Oakland Living Ctr., Inc*., 48 F.4th 222 (4th Cir. 2022). That said, a plaintiff must display that the employer had a high degree of control over the third party to establish employer liability. *See Menaker v. Hofstra Univ.*, 935 F.3d 20, 42 (2d Cir. 2019).

email, with nothing more, is insufficient to establish that the email originated from a member within the University Community.

Moreover, the contents of the second email do not display any intimate knowledge of Dr. Bility's research. The facts pled within his Second Amended Complaint also contradict the date on which he received the second email. In the Second Amended Complaint, Dr. Bility pleads that he received the second derogatory email on November 14, 2020 (ECF No. 28, at ¶ 25(g)(ii)). Dr. Bility also alleges that he received the second email "within an hour" of the Zoom town hall. (*Id.* at ¶ 25(i)). Dr. Bility alleged that the Zoom town hall occurred on November 12, 2020. *Id.* ¶ 25(f)). Therefore, the alleged immediacy of the email does not comport with Dr. Bility's own allegations. In any case, Dr. Bility pleads that the Zoom town hall was public, such that anyone could have attended, even those from outside the University community. Thus, as to timing and scope of access to the Zoom town hall, Dr. Bility fails to sufficiently plead any origination from a member within the University community. Further, Dr. Bility's conclusory allegation, that the emails must have come from the University community, because he had only distributed his email within the University community, does not sufficiently establish employer liability. Dr. Bility published a pre-print of his article to ResearchGate. (ECF No. 28, at ¶ 24). The defense noted that Dr. Bility's university email was indicated on the first page of said article. *See* (ECF No. 28-2, at 1). Thus, anyone who viewed the article could have had access to Dr. Bility's university email address. Further, any member of the public could have found Dr. Bility's email address, because it was posted on the University's website. Therefore, even with the additional facts asserted in the Second Amended Complaint, Dr. Bility fails to establish any facts sufficient to establish that respondeat superior liability applies to the University in relation to the anonymous derogatory emails.

11

As such, for the reasons discussed within the Court's October 25, 2023 Memorandum Opinion, and for the reasons discussed above, the University's Motion to Dismiss Dr. Bility's Title VII hostile work environment claims against it, at Count I of the Second Amended Complaint, will be granted. Dr. Bility's Second Amended Complaint fails to allege sufficient facts to establish a hostile work environment claim. Dr. Bility will not be granted leave to amend his hostile work environment claim, because further amendment would be futile.

    ii.    *Disparate Treatment Claim*

Dr. Bility brings a race discrimination claim under Title VII for disparate treatment, alleging that the University did not promote him to a tenured position, because he is Black. Dr. Bility argues that other non-Black professors were treated more favorably than him when being considered for tenure. (ECF No. 28, at ¶ 62). The University argues that Dr. Bility fails to establish sufficient facts to allege that the decision to not grant Dr. Bility tenure was because of his race. (ECF No. 30, at 15-16). "Discrimination may be inferred based on comparator evidence—evidence that defendant treated "similarly situated" individuals not within plaintiff's protected class more favorably than it treated plaintiff" *Darby v. Temple Univ.*, 216 F. Supp. 3d 535, 542 (E.D. Pa. 2016) (citing *Wilcher v. Postmaster Gen.*, 411 F. App'x 879, 881 (3d Cir. 2011)).

To state a claim for discrimination under Title VII, based upon disparate treatment, Dr. Bility must allege that he: (1) is a member of a protected class; (2) was qualified for the position that he sought to attain or retain; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. *See Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).

The only additional facts that Dr. Bility provides in his Second Amended Complaint, regarding the University's decision to not grant him tenure, are: (1) a list of the non-Black faculty at the Department of Infectious Diseases and Microbiology at the University; (2) a statistic about the number of tenured professors at the University who are Black; (3) an allegation that Dr. Bility is the only Black professor in the Department; (4) positive reviews about Dr. Bility's work at the University; and (5) a pay raise that he received.

First, the list of non-Black professors within the Department of Infectious Diseases and Microbiology at the University, provided by Dr. Bility, does not indicate whether these are tenured professors, or how their respective race factors into the University's tenure decision regarding Dr. Bility. The only connection Dr. Bility makes, in comparing the professors to himself, is a conclusory statement that he is "intimately familiar with the employment circumstances of the similarly situated positioned [sic] Non-Black scientists or professors and knows that he was solely targeted and subjected to hostile work environment and retaliation as a result of his race while others were not." (ECF No.28, at ¶ 12-13). Such bare conclusory allegations are not sufficient to establish any inference of intentional discrimination.

Next, Dr. Bility alleges statistics about the number of Black tenured professors at the University in comparison to the population of Black people in Pittsburgh. Dr. Bility pleads that, according to an article published by PublicSource in August 2021, "out of the 1,163 tenured faculty members at the University's main campus, only 27 were Black, constituting roughly 2% of the tenured faculty. This percentage is significantly lower than the Black population of Pittsburgh, which stands at 22%." (*Id*.). The general population of Pittsburgh is not a proper comparison to those persons qualified to be a tenured professor at the University. As such, said statistics are not sufficient to raise an inference of intentional discrimination.

13

Finally, Dr. Bility alleges that he is the only Black professor in the Department of Infectious Diseases and Microbiology. Dr. Bility does not plead any facts to connect his race and his being the only Black professor in the department, to the University's tenure decision in his case. Therefore, said allegations are not sufficient to raise any inference of discrimination.

Thus, the University's Motion to Dismiss Dr. Bility's disparate treatment and race discrimination claims under Title VII, at Count I of the Second Amended Complaint, will be granted. Dr. Bility's Second Amended Complaint fails to allege sufficient facts to establish any Title VII race discrimination or disparate impact claim. Dr. Bility will not be granted leave to amend his Title VII race discrimination and disparate impact claim, because further amendment would be futile.

**Count II – Title VII Retaliation Claim**

Dr. Bility brings a Title VII retaliation claim against the University. The University argues that Dr. Bility fails to state a claim for retaliation against the University, because Dr. Bility failed to establish a plausible causal connection between any protected activity and any adverse employment action. (ECF No. 30, at 18). Dr. Bility argues that the University retaliated against him on various occasions. Dr. Bility alleges that the University retaliated against him by (1) appointing Dr. Jessica Burke, Dr. Donald Burke's daughter, as interim chair of Dr. Bility's department to "intimidate Dr. Bility" in April 2021 (ECF No 28, at ¶ 55); (2) by "blocking" Dr. Bility from mentoring a group of high school students in April 2022 (*Id.* ¶ 56); (3) by restricting Dr. Bility from obtaining fetal tissues from ABR (*Id.* ¶ 57); and (4) by stalling Dr. Bility's tenure review, "insisting that Dr. [Jessica] Burke serve as author of the chair's letter of recommendation" for tenure, and the eventual denial of Dr. Bility's tenure. (*Id.* ¶ 58). Dr. Bility

14

avers that all these actions were because he complained about race discrimination against Dr. Donald Burke and Dr. Lichtveld. *Id.*

Title VII prohibits discrimination against any individual, "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also prohibits an employer from discriminating against an employee who has opposed an employer's discriminatory conduct or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" related to the employer's discriminatory conduct. 42 U.S.C. § 2000e-3(a). To establish a prima facie retaliation claim, a plaintiff must show that (1) they engaged in conduct protected by Title VII; (2) their employer took an adverse employment action against them; and (3) a causal link existed between their protected conduct and the employer's adverse action. *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016). As to the third element, if there is a causal connection between the protected conduct and the adverse action, the "the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred." *Mercer v. SEPTA*, 608 Fed. Appx. 60, 65 (3d Cir. 2015) (quoting *Krouse v. Am. Sterlilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997)). As such, an "adverse action must occur within days, not months, of the protected activity." *Id.*

As regards events (1)-(3) listed above, this Court discerns no new allegations within the Second Amended Complaint that address said events; therefore, the Court relies on its analysis within the October 25, 2023 Memorandum Opinion, finding insufficiency of said retaliatory events. For the reasons stated within the Court's October 25, 2023 Memorandum Opinion, and those discussed above, Dr. Bility's Second Amended Complaint fails to allege sufficient facts to establish any retaliation claim against the University as relates to alleged retaliatory acts (1)-(3). Thus, the University's Motion to Dismiss Dr. Bility's Title VII retaliation claim against it, as

regards said alleged acts (1)-(3), at Count II of the Second Amended Complaint, will be granted. Dr. Bility will not be granted leave to amend his retaliation claim regarding said retaliatory acts, because further amendment would be futile.

As for the fourth alleged retaliatory event, the University's denial of tenure, Dr. Bility provides some additional facts in his Second Amended Complaint. Dr. Bility alleges that the University's decision to deny him tenure occurred "within two months of him filing his federal discrimination claim." (ECF No. 28, at ¶ 58). Dr. Bility filed his original Complaint in this action on May 10, 2023; however, he was informed that he did not receive tenure on June 28, 2023. (*Id.*). Forty-nine days passed between Dr. Bility filing his first Complaint and the University's final tenure decision. At this stage of the proceedings, the Court cannot determine whether such passage of time is unusually suggestive that a causal link existed between the filing of Dr. Bility's original Complaint in this action and the University's denial of tenure. As such, at his stage, Dr. Bility has pled sufficient facts to support his retaliation claim for denial of tenure based upon his filing of his Complaint alleging racial discrimination. In making this determination, the Court is not opining on any issues of exhaustion of administrative remedies as to this claim. Thus, the University's Motion to Dismiss as to this alleged retaliatory act, will be denied.

### B. Count III – 42 U.S.C. § 1983 Equal Protection Clause Claims

Dr. Bility brings Equal Protection Clause claims against Drs. Donald Burke and Lichtveld for racial discrimination. (ECF No. 28, at ¶ 69). After review of the Second Amended Complaint, the only new allegations related to these claims are conclusory; Dr. Bility provides no facts to support said conclusory allegations. Such new allegations do not change the Court's conclusion from its October 25, 2023 Memorandum Opinion. For the reasons stated in said Opinion, the

University's Motion to Dismiss Dr. Bility's Equal Protection Clause claims against Drs. Donald Burke and Lichtveld, at Count III of the Second Amended Complaint, will be granted. The Second Amended Complaint fails to allege sufficient facts to establish a §1983 Equal Protection Clause claim. Dr. Bility will not be granted leave to amend his Equal Protection Clause claims, because further amendment would be futile.

**Count IV – 42 U.S.C. § 1981 through 42 U.S.C. § 1983 Equal Protection Clause Claims**

Dr. Bility brings a 42 U.S.C. § 1981 claim against all Defendants. (*Id.* at ¶ 76). Drs. Donald Burke and Lichtveld argue that Dr. Bility fails to sufficiently plead facts that allege an adverse employment action or intentional discrimination, or that race discrimination was the but-for cause of any lost enumerated right under § 1981. (ECF. No. 29, at 2). The University argues that Dr. Bility fails to allege intentional discrimination or adverse employment action by the University. (*Id.*). Dr. Bility argues that all Defendants intentionally discriminated against him, and that race was the but-for cause of the loss of his 14th Amendment rights under §1981. (ECF No. 33, at ¶ 69-71).

As no new allegations to support these claims are made within the Second Amended Complaint, for the reasons stated within the Court's October 25, 2023 Memorandum Opinion, Dr. Bility fails to allege sufficient facts to establish a § 1981 claim against any Defendant. The Defendants' Motion to Dismiss the § 1981 claims against them, at Count IV of the Second Amended Complaint, will be granted. Dr. Bility will not be granted leave to amend his § 1981 claim as to any Defendant, because further amendment would be futile.

**IV.   Conclusion**

For the reasons stated above, and for those discussed within the Court's October 25, 2023 Memorandum Opinion, Defendants' Motion to Dismiss will be granted in part and denied in part. Defendants' Motion to Dismiss will be granted, with no leave to amend, as follows:

- Dr. Bility's Title VII claims against the University for hostile work environment, disparate treatment, and discrimination based upon his race, at Count I of the Second Amended Complaint;

- Dr. Bility's Title VII retaliation claim against the University as to retaliatory acts (1)-(3), at Count II of the Second Amended Complaint;

- Dr. Bility's § 1983 Equal Protection Clause claims against Drs. Burke and Lichtveld, at Count III of the Second Amended Complaint; and

- Dr. Bility's § 1981 claims against all Defendants, at Count IV of the Second Amended Complaint.

Defendants' Motion to Dismiss Dr. Bility's Count II retaliation claim against the University, as regards his claim, that the University denied him tenure in retaliation for his filing of the present action, will be denied.

A separate order will follow.

DATE: __3/18/2024_____

Marilyn J. Horan
United States District Judge